| 57 | 511 |
| 62 | 97 |

# ABRAM S. HEWITT

*v.*

# THE LEHIGH AND HUDSON RIVER RAILWAY COMPANY.

[Decided February 3d, 1899.　Filed June 12th, 1899.]

1. Failure of the arbitrator to view the premises cannot affect an award as to their value, in the absence of request to do so, he being familiar with them.

2. The owner of land wanted by a railroad wrote the latter's representative, "I am perfectly willing to take the judgment of any fair man as to what damage this does to the property," and later, "There is only one other way which I can suggest to avoid litigation, and that is to ask Mr. H. to decide how much you are to pay, and for his decision to be final." The reply was, "Your suggestion relative to leaving the matter to decide to Mr. H. meets with my approval." The representative also wrote to Mr. H., enclosing maps containing a description of the land. The arbitrator agreed in writing to act. —*Held*, that it was a complete submission in writing, and hence not within the statute of frauds.

3. Where defendant to a bill to enforce an award admitted the agreement to submit to arbitration, the actual submission and the award, and failed to set up the statute of frauds as a defence in his answer, he cannot insist on it at the hearing.

4. Where the only question in a submission was the amount to be paid for land already taken, and a conveyance of which could have been compelled, it was not a case requiring the submission to be in writing, and hence was not within the statute of frauds.

5. Where neither in the negotiations and correspondence leading up to a submission, in the arbitration itself nor in the proceedings to condemn involving the same subject-matter, was an equitable defence interposed, it will be deemed waived in a suit to restrain the condemnation.

6. Where a party agrees to a second submission, and afterwards repudiates the award therein, and begins condemnation proceedings, he waives all rights under the first award.

7. A party to an arbitration cannot repudiate the award for causes within his knowledge before it was made.

8. In the absence of misconduct or want of good faith in an arbitrator, the fact that the award seems too high or too low is not ground for judicial interference.

Heard on bill, answer and proofs.

*Mr. Charles L. Corbin,* for the complainant.

*Mr. George M. Shipman,* for the defendant.

PITNEY, V. C.

The object of the bill is to enforce a submission to arbitration followed by an award of the arbitrator. The subject-matter of the arbitration was the price which the defendant railway company should pay the complainant for two strips of land belonging to him, taken and used by the railway company, by complainant's permission, for many years before the submission. The immediate relief sought is to enjoin proceedings taken after the award, by the railway company, under the statute, for the condemnation of the lands and the appointment of commissioners by a justice of the supreme court.

The bill was filed and a preliminary injunction granted just before the award was made, but the injunction was not served in time to prevent its being made. The affidavit annexed to the bill will not be considered.

The submission was made by correspondence passing between the complainant and Mr. Grinnell Burt, the president of the defendant corporation, concerning the matter of the settlement of the price to be paid, Mr Burt being fully authorized by the board of directors of the defendant to deal therewith. The arbitrator agreed upon was Mr. Joseph S. Harris, a well-known railroad man and a director of the defendant corporation. He was furnished by Mr. Burt with maps of the lands taken, and subsequently Mr. Burt, representing the defendant, and the complainant in person met before the arbitrator at a time and place designated by him, and the arbitrator heard the allegations of the parties and later on made his award in writing annexed to the maps, fixing the amount to be paid, as follows:

"PHILADELPHIA April 30th, 1898.
"*To Messrs. Abram S. Hewitt and Grinnell Burt:*

"GENTLEMEN—After due consideration of the question submitted to me for decision by you, being the amount of damages which should be paid by the Lehigh and Hudson River Railway Company to Abram S. Hewitt for land the

Hewitt *v.* Lehigh and Hudson River R. R. Co.

property of Hewitt in Warren county, New Jersey, taken for the construction of the railway, I find that for the land taken on the Green farm the railway company should pay Hewitt $162, and for the land taken near Pequest Furnace the railway company should pay Hewitt $1,112.40, these amounts to be in full for the value of the land taken, for interest thereon and for damages, the amount of land taken being 1.44 acres on the Green farm and 8.24 acres near Pequest Furnace, the boundaries thereof being as shown on the accompanying blue prints.

" Yours respectfully,

" JOSEPH S. HARRIS."

The defendant refused to be bound by this award and initiated the proceedings which are sought to be enjoined.

The answer admits the submission, the meeting of the parties before the arbitrator and the award, and sets up various matters in avoidance of it, only one of which affects the conduct of the arbitrator, viz., that he did not, after hearing the parties, go upon the ground and view the premises. It does not appear that he was asked to do so, but the defendant's counsel suggested that it was his duty to do so without being asked. It is, however, clearly proven that he had previously, on several occasions, been upon the premises and was familiar with them. Hence, I think his failure to go upon the premises after the submission, and in the absence of any special request to do so, cannot be set up as affecting his award. The counsel of defendant at the hearing expressly disavowed any intention to charge the arbitrator with any bad faith or willful misconduct.

The first ground after that just mentioned, taken by defendant, was that the submission to arbitration was not put in formal writing, and therefore, as it affected lands, was rendered void by operation of the statute of frauds.

I think there are three complete answers to that point:

*First.* It seems to me that there was a sufficient submission in writing. It appears that General Burt and complainant had one or more interviews on the subject of complainant's making a legal title to the railroad company for the strips of land taken by it, and that .on the 27th of April, 1896, Mr. Burt wrote to complainant, as follows:

33

"Owing to illness in my family, I have had no time to take up the matter of our right of way through the Pequest property. We will take right of way—8.97-100—a description of which I enclose. Considering the talk we have had from time to time in relation to this right of way, I had hoped that you would convey to us the necessary land required after my conversation with you the other day. It seems to me that if we paid you forty or fifty dollars per acre for the amount we take, it would be about right. Please let me hear from you, and oblige."

In answer to that letter, complainant, on May 26th, 1896, wrote to Mr. Burt, as follows:

"As to the right of way, I am prepared to convey the land which you require at a fair price. What that may be, I do not know. I paid $75 per acre for the tract of forty acres adjacent to the right of way. The latter is a strip along the river, cutting the place in two and depriving us of access to the river. I am perfectly willing to take the judgment of any fair man as to what damage this does to the property, and to convey the right of way to you for the amount which such a person may decide to be just."

Subsequently, there was an attempt to ascertain the amount to be paid by an arbitration which the complainant refused to accept, and which will be noticed farther on.

On the 30th of March, 1898, Mr. Burt wrote to the complainant as follows:

"When you last went to Europe, you informed me that when you returned you would notify me that we might take the matter of right of way for our road through the Pequest Furnace and other property. Your refusal to abide by the award of the arbitrators leaves us in the position to settle the matter only by calling on the court to appoint commissioners to fix the damages. If agreeable to you, please let me know by return mail."

To which complainant replied as follows, under date of March 31st, 1898:

"In reply to your letter of the 30th inst., I have to say that there does not appear to be any other method of settling the matter, except to have commissioners appointed and condemn the right of way. The award made by the arbitrators was so inadequate that if it were to stand, I would prefer to have the credit of giving you the land for nothing. There is only one other way which I can suggest to avoid litigation, and that is to ask Mr. J. S. Harris to decide how much you are to pay, and for his decision to be final. I am perfectly aware that he represents the interest which is adverse to me, but he is a man so just that I am quite willing to take his opinion, even if he decides that nothing should be paid. provided you show him this letter."

In reply thereto Mr. Burt, on April 4th, 1898, wrote to complainant as follows:

"Your favor of the 31st ult. received. Your suggestion relative to leaving the matter to decide to Mr. Joseph S. Harris meets with my approval provided he will perform those duties. I will show him your letter, which I hope to do this week. If he declines we will be compelled to resort to the appointment of commissioners to condemn the right of way."

Mr. Burt also, at the same time, wrote to Mr. Harris enclosing maps containing a description of the land. That letter was not produced. Mr. Burt testified that he had a copy of it at home, and it was agreed that he should furnish it for use at the argument, but it was not furnished.

In pursuance of that letter Mr. Harris, on April 18th, 1898, wrote the complainant as follows:

"Mr. G. Burt, president Lehigh and Hudson River Railway Company, forwarded to me some days ago a letter from you to him, in which you suggested that a certain unsettled matter of right of way should be left to my decision. I notified Mr. Burt that I was willing to act, and he has sent me maps showing the right of way required, being 8.24 acres near Pequest Furnace, and 1.44 acres at some other point not designated. Will you kindly advise me in what way you desire to present your case, whether by letter or otherwise? If you desire to present it personally, I have no doubt that within a week or two I should be able to make an appointment in New York to meet both you and Mr. Burt."

Later, Mr. Harris appointed a time and place of hearing, when both parties appeared before him, and he, with the maps before him, expressly asked each—Mr. Burt and complainant—whether they each agreed to be bound by his award, and they each assented thereto and presented their respective cases, with such evidence as they chose to produce.

Now, it seems to me that, taking all this correspondence and the delivery to Mr. Harris by Mr. Burt of the description of the land, it makes a complete submission in writing. The location, description and quantity of land to be appraised were clearly designated, and the single question submitted was the amount the defendant should pay the complainant.

*Second.* The defendant in its answer admitted substantially
the agreement to submit, the actual submission and the award,
and failed to set up, either by plea or its equivalent, the statute
of frauds as a defence. This, it seems to me, is fatal to that
defence being insisted upon at the hearing, especially in a case
where the evidence shows such a complete understanding between
both parties as to what was the actual submission, and where
both parties have been fully heard. But,

*Third.* I am of the opinion that the statute of frauds does
not apply to this case, for the simple reason that the title to
land did not in anywise come into question, the only question
being the amount of compensation which the defendant should
pay the complainant for land which it already had in possession,
and which it could have compelled the complainant to convey
to it upon terms. It seems to me to require no authority to
sustain the proposition that after the defendant had taken pos-
session of these lands with the full consent and approbation of
complainant (the owner), had expended moneys in grading and
filling and constructing expensive works over the same, and had
used them for over ten years, this court would never permit the
complainant (the owner) to eject it therefrom by legal proceed-
ings, but would declare and decree, upon application for that
purpose by the defendant, that the equitable title passed to the
defendant by the consent of the complainant, subject only to the
payment by defendant to the complainant of the price and value
thereof agreed upon, if it were agreed upon between the parties,
or if there was no such agreement, then just compensation to be
ascertained by this court. The precise situation of the parties,
in the view of a court of equity, was this: that the defendant
was in possession of and held the equitable title to these lands,
and that the complainant held the legal title thereto as mort-
gagee, as security for the value of the lands before possession
taken, with the incidental damages, to be ascertained by this
court if application was made therefor by the defendant. This
position the complainant at all times clearly admitted. He at
no time made any pretence to any right to withhold a convey-

ance of the legal title except for the purpose of securing himself the amount of just compensation for the premises.

It is equally well settled that a submission to arbitration by parol, and an award thereunder, is perfectly good except in such cases as are forbidden by the statute of frauds, the rule being that whatever the parties may agree to between themselves by parol they may agree to submit to a third party to determine between them.    And there can be no doubt in this case that if Mr. Burt and complainant had come to a positive parol agreement by which the defendant should pay to the complainant a certain sum of money as just compensation for the lands in question, such agreement would have been binding on both parties and complainant would have been compelled to convey the land on the payment of that sum.    On this subject I refer to *Kyd on Awards* (book of the last century) *p. 10; Caldw. Arb. ch. 3 p. *15;* and see note to page 36 of the edition of 1853. The distinction in question was taken in *Walters* v. *Morgan, 2 Cox C. C. 369.*    The same law is laid down by Mr. Morse in his book on *Arbitration and Award p. 50;* and see *Wells* v. *Lain, 15 Wend. 99; Valentine* v. *Valentine, 2 Barb. Ch. 430* (at *p. 437*); also *French* v. *New, 20 Barb. 481,* and on appeal, *28 N. Y. 147.*    A case much in point is *Davy's Executors* v. *Faw, 7 Cranch 171* (at *p. 176*) (*Supreme Court United States*), where, in answer to a point similar to that made in this case, Chief-Justice Marshall says : " That is where the title is in question.    But here the title was conveyed.    The dispute was only as to the price.    The question of title was not submitted."

In *Jackson* v. *Gager, 5 Cow. 383,* the supreme court of New York dealt with a parol submission to arbitration, and (at *p. 386*) Mr. Justice Sutherland says : "The object of the submission was to ascertain and settle the true location of a particular lot of which the parties to the submission were joint proprietors, the surrounding or adjoining lots, or some of them, belonging to them in severalty.    It was, then, an agreement that the arbitrators named should determine the boundaries of the common lot, according to the description in the partition deed of the patent, under which both parties derived their title."    Then, after stating

authority for the proposition that a parol agreement between proprietors of two adjoining lots to abide by a certain division line was not within the statute of frauds, he states the law thus: " If a parol agreement between the parties, fixing the location or boundaries of a lot, is valid, a similar agreement that certain persons named by them shall ascertain and determine the true location, would seem to be equally exempt from the operation of the statute of frauds."

And in *Mitchell* v. *Bush*, *7 Cow. 185*, the same court held that a parol agreement to submit to arbitration and an award thereunder of the amount which the defendant should pay the plaintiff for the use of a private road which the plaintiff had laid out was good and not within the statute of frauds.

Other matters were urged to show a sort of equitable defence to the complainant's bill. First, it was urged that when the railway was located and constructed complainant encouraged it by holding out the idea that if the freight rates charged by the railway company were satisfactory he would not charge anything for the land, but would make a conveyance thereof. That some such arrangement was made is admitted by the bill, and by complainant on the stand, but he swore that the conditions which he imposed were never fulfilled by the defendant; that it never did give him satisfactory freight rates. This defence does not seem to be clearly made out by proof, but if it were made out, I am unable to see that the defendant can avail itself of it, for the reason that it has deliberately waived it. If it be true that there was an actual and definite agreement between complainant and the defendant's agent, at the time the road was laid out, that the lands should be conveyed for a nominal consideration upon the performance of certain conditions, and those conditions were performed, then the defendant should long ago have filed a bill in this court to establish its equitable title to the land and to compel complainant to make a conveyance thereof. But it never, in any of the negotiations or correspondence between the parties, put itself upon that ground, and it seems to me that the submission to arbitration in this case, and later on the institution of statutory proceedings to condemn, amount to a complete aban-

donment of that position. The defendant seems to have made the radical mistake of supposing that, when it went before an arbitrator or before commissioners appointed by a judge to ascertain the compensation to be paid for this land, it could successfully set up and rely upon the fact that complainant originally promised to give the land to the railway company. This mode of getting the benefit of complainant's original promise seems to me to be quite inadmissible. The commissioners appointed by a judge, or this court acting in the same capacity, in ascertaining the actual value of the lands taken and damages resulting from the taking, are not permitted to take into consideration any promise on the part of complainant to convey without compensation or any benefit to him by the location of the railroad.

The next defence set up is that the parties previously submitted this very question to arbitration by Mr. J. Blair Kelsey, of Belvidere, and that Mr. Kelsey made an award. The fact of submission to Mr. Kelsey and the details of the award are not proven, and some letters, copies of which were annexed to the answer in support of this proof, were not produced at the hearing. The fact that Mr. Kelsey, under some sort of submission, did make an award was proven, and that complainant repudiated that award at once is also proven. It is but justice to the complainant to say that he declares that the settlement of the amount to be paid was, in the year 1896 or 1897, left to his agent, Mr. Fackenthall, and to Mr. Burt, and that Mr. Burt appointed an agent by the name of Albertson to act with Mr. Fackenthall. It would seem, although it was not proven, that these two—Fackenthall and Albertson—not being able to agree, called in Mr. Kelsey without the knowledge or consent of the complainant, and it was his award that the complainant repudiated. Now, it seems to me clear enough that if that award was binding upon the complainant, then it was clearly the right of the defendant to file its bill in this court for the performance of that award, and upon tender of the amount found by Mr. Kelsey, to have obtained the decree of this court to compel complainant to make the desired conveyance. Not having so asserted its right, but having agreed with complainant to make a second submission to

Mr. Harris, and having itself repudiated his award and taken condemnation proceedings, it seems to me that it must be held to have also waived any rights it had under Mr. Kelsey's award. It does not in its answer, by way of a cross-bill, waive its condemnation proceedings which are sought to be restrained by this bill, and ask for the specific performance of Mr. Kelsey's award.

This leaves only one other matter to be dealt with, and that is a written agreement entered into between the defendant and the firm of Cooper & Hewitt on the 26th of April, 1887, on which is based the point that Mr. Burt was deceived by complainant and surprised by the developments at the hearing before Mr. Harris.

The railroad was laid and built about 1881 or 1882 from Belvidere up the valley of the Pequest river, through Warren and Sussex counties, to a point in the county of Orange, in the State of New York. At that time complainant was the owner of the land here in question, and upon it was built a blast furnace called the "Pequest Furnace." There were also a farm, farm buildings and some cottages for the accommodation of laborers working in the furnace. It was situate on the Pequest river at the crossing of the Delaware, Lackawanna and Western railroad. The blast furnace was operated by the firm of Cooper & Hewitt, and that firm obtained its coal and ores and shipped its product over the Delaware, Lackawanna and Western railroad. The defendant's railway crossed the Delaware, Lackawanna and Western railroad near the furnace, and traversed the furnace tract for a long way. For the accommodation of both parties a trestle switch was built leading from the main line of defendant's railway into the furnace grounds, and also forming part of a junction with the Delaware, Lackawanna and Western railroad, the actual crossing of the two railroads being not at grade. This trestle and switching arrangement was erected at considerable expense about the year 1882, without anything in writing either as to its use or the right of the defendant to maintain it there, or as to the rate of freight to be charged, until the year 1887, when the agreement in question was made. That provided for the use of the trestle itself, its reparation and main-

tenance, and fixed a certain amount for freight rates to be charged to the firm of Cooper & Hewitt, but by its terms ended in 1896. It made no mention whatever of compensation for the right of way of the main line now in question, but dealt wholly with the switch trestle before mentioned.

The changes in the cost of the manufacture of iron and its price when manufactured, led to the blowing out of the furnace somewhere in the year 1890 or 1891, after which and up to this time it has remained idle.

Now, Mr. Burt swears that he went to the hearing before Mr. Harris with the idea that it was the firm of Cooper & Hewitt that owned this land, and that the contract just mentioned had a bearing upon the question to be decided by the arbitrator; but he did not produce that contract or offer it in evidence, and contented himself with referring the arbitrator to the fact that the contract was made, and says he was surprised to hear complainant declare that he was not bound by that contract, because, although he was a member of the firm of Cooper & Hewitt, he himself was the sole owner of the lands. But the evidence shows clearly that Mr. Burt had known for years that complainant was the sole owner of the land, and the evidence further satisfies me that all that complainant claimed at the hearing before Mr. Harris, with regard to the contract of 1887 with Cooper & Hewitt, was that it did not and could not refer to the conveyance of the land, for the reason that Mr. Cooper had no interest in the land itself. Mr. Burt swears that he had not read the contract for some time before going before Mr. Harris, and, under oath, makes this remarkable statement:

" When I got home 'and read this contract of '87, and read Mr. Hewitt's letter, I said to myself I will repudiate the submission to Mr. Harris if he brings in anything more than Mr. Kelsey had brought."

Now, it is hardly necessary to say that a party situated as Mr. Burt was cannot speculate on the result of an arbitration. If he has reason or ground to repudiate his submission, he must do so promptly and before the award is made. He cannot withhold his repudiation until he ascertains whether or not the award

is favorable to him. Mr. Burt seems to have entertained the notion that because the complainant had refused to be bound by the award of Mr. Kelsey, he (Mr. Burt) might in turn repudiate the award of Mr. Harris if it did not suit him. This notion, of course, is untenable.

Finally, the general complaint is made that the award is outrageously high. I understand the rule on this subject generally to be that in the absence of any misconduct or want of good faith in the arbitrator, the mere fact that his award seems too high or too low, as the case may be, is not sufficient to induce the court to interfere. In other words, where the arbitrator has exercised his judgment fairly, after giving all the parties an opportunity to be heard and present all their evidence, this court will not review his judgment. I find nothing in this case that would warrant the inference that the award was not the result of a judicial view of the evidence presented and an honest judgment of the arbitrator thereon.

For these reasons I think the award must be upheld and the injunction made perpetual, the complainant offering to make a conveyance on being paid the amount of the award.

The complainant is entitled to costs.